**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| | : | |
| SHAWNNA CHRISTOPHER, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 03-2589 (KSH) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| STATE OF NEW JERSEY, and | : | |
| DEPARTMENT OF HUMAN SERVICES, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**KATHARINE S. HAYDEN, U.S.D.J.**

*Pro se* plaintiff Shawnna Christopher ("Plaintiff") filed this civil action in May 2003 against the State of New Jersey, the New Jersey Department of Human Services ("DHS"), Roman Lemega, and Darin Schiffman.  The Complaint alleges that defendants terminated her employment at the Woodbridge Developmental Center ("WDC") on the basis of her race and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).  The Complaint alleges that defendants are liable for "hiring [her] for a high position then lowering position once employed," and for "requiring African Americans to have one year experience and not white employees."  (Compl. ¶ 9.)  It also claims that DHS does not hire African Americans for high positions and degrades females.  (Compl. ¶ 10.)  On August 14, 2004, the Court dismissed the claims against Lemega and Schiffman on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  Currently before the Court is a motion for summary judgment filed by the remaining institutional defendants.  For the reasons that follow, defendants' motion is **granted.**

I.      BACKGROUND

The facts are gleaned from the written submissions of the parties, along with the exhibits

and declarations submitted for the Court's review.

This lawsuit arises out of plaintiff's employment with DHS for approximately two

months in 2002.  On July 18, 2001, plaintiff applied for a position with DHS, and set forth in her

employment application that she had a college degree from Kean University, but had no

employment history since age 18.  (3/16/04 Christopher Dep. at 100:14-21; Guz Decl.,

Employment Application, Exh. A.)  In August 2001, plaintiff received a letter stating she had met

the minimum requirements for the position of Senior Therapy Program Assistant ("STPA"), part-

time.  (Guz Decl., 8/21/01 Letter, Exh. B.)  Plaintiff interviewed with Louis Arminio

("Arminio"), Staff Clinical Psychologist in the Psychology Department of DHS, on November

27, 2001 for a STPA position at WDC.  (5/16/04 Christopher Dep. at 96:25-97:2; Guz Decl.,

Applicant Interview Summary, Exh. C.)  After the interview, Arminio completed an "Applicant

Interview Summary" and wrote that he would recommend plaintiff for a part-time Behavior

Modification Program Technician ("BMPT") position or full-time STPA position and he would

only consider plaintiff for a full-time BMPT position if the WDC was "needy" and there were no

other STPA openings.  (Guz Decl., Applicant Interview Summary, Exh. C.)  He also wrote that

her academics and experience were weak, but that she still might be a motivated and capable

worker.  Id.

On December 7, 2001, plaintiff received a letter from Brenda Baxter, the Manager of

Human Resources.  Baxter wrote that based upon plaintiff's interview with the Director of

Psychology at WDC, one Dr. Lemega ("Lemega"), DHS was offering her a position as a BMPT.

(Guz Decl., 12/7/01 Letter, Exh. D.)  This letter was facially wrong in two respects:  plaintiff had actually interviewed with Arminio, and she sought and was interviewed for an STPA position.

Defendants admit the letter was incorrect.  (Guz Decl. ¶ 18.)  Defendants also state that the BMPT position required one year of work experience in rehabilitation or therapeutic treatment for the mentally ill or developmentally disabled.  (Lemega Decl. ¶ 14.)

Notwithstanding Baxter's letter, DHS began preparing the paperwork for plaintiff's employment as a full-time STPA (the position she interviewed for), *not* as a BMPT.  (Guz Decl., 3/5/02 Letter, Exh. E.)  On March 5, 2002, Barbara Danku ("Danku"), a personnel assistant at DHS, sent plaintiff a letter congratulating her about her position as a full-time STPA and informing her of a required orientation class.  Id.

Plaintiff found out that the STPA position annually paid $7,000 less than the salary for a BMPT.  (3/16/04 Christopher Dep. at 117:24-118:15.)  While she was attending orientation during her first week of employment, she went to Human Resources and spoke to Beverly Guz ("Guz") regarding the "discrepancy" in the positions referred to in the two letters.  (3/16/04 Christopher Dep. at 125:13-126:7.)  After Guz said that she would look into things, plaintiff admitted at her deposition that she told Guz,  "[Y]ou'll be sorry if you don't give me the BMPT position." (3/16/04 Christopher Dep. at 126:3-126:7.)  Plaintiff said she did not "threaten" Guz, but meant she would fight for the position "union-wise."  (3/16/04 Christopher Dep. at 126:8-126:13.)

In the interim, Lemega was informed, erroneously, that plaintiff would start as a full-time BMPT in his department.  (Lemega Decl., 3/8/02 Email, Exh. D.)  In reviewing her application, Lemega saw that plaintiff did not have the requisite one year of work experience.  Id.  He e-

3

mailed Danku, stating, "Confusion has set in, we got a call from your office that [plaintiff] is starting work . . . as a BMPT full timer.  I checked interview application and she does not have th[e] one year requirement for BMPT.  I will be happy to take her as a full time stpa/ whatever you can do.  We were also told that she was assigne[d] to position # 640335 which was last held by part timer . . . in a stpa-bm title."  Id.  Guz wrote back that "STPA is the title we have on record for [plaintiff]."  Id.

DHS allowed plaintiff to remain in the BMPT position.  (Guz Decl., 3/18/02 Inter-Office Memorandum, Exh. F.)  Defendants upgraded the offer from a part-time BMPT position (which plaintiff was originally offered) to a full-time BMPT position.  Id.  On March 11, 2002, plaintiff began working in Lemega's department under the supervision of Darin Schiffman ("Schiffman"). (Guz Decl. ¶ 20.)  Within the first week, plaintiff received a memo confirming her position as a BMPT with a salary of $34,450.23.  (Guz Decl., 3/18/02 Inter-Office Memorandum, Exh. F.) The memo also stated: "Please be advised that you are considered provisional in this position. You must file for and pass the Open Competitive examination for the title of Behavior Modification Program Therapist to achieve permanency.  Without permanent status you may be displaced from this provisionally appointed position."  Id.  Plaintiff signed the memo.  Id.

Within the first week of employment, plaintiff asked for her hours to be changed. (3/16/04 Christopher Dep. at 165:11-166:20; Schiffman Decl. ¶ 19.)  Plaintiff also asked for a transfer from her designated work location because she was not getting along with a co-worker, Tanya Townsend ("Townsend").  (5/19/04 Christopher Dep. at 43:23-44:10; Schiffman Decl. ¶ 21.)  Plaintiff requested that her supervisor Schiffman contact Lemega regarding a transfer, but Schiffman refused, stating that she was "barking up the wrong tree."  (Schiffman Decl. ¶ 24.)

4

Schiffman stated in his Affidavit that he meant that approaching Lemega regarding a transfer was not the right way to solve any problems Christopher might have with her work.   Id.   Schiffman also stated that despite his attempts to explain the use of the phrase, plaintiff "became visibly angry and used profanity to express her anger."   Id.   Schiffman wrote in a memo to Lemega that he offered to help resolve plaintiff's problems, but she refused his help, becoming agitated, using profanities, and demanding that he speak with Lemega.  (Schiffman Decl. ¶ 25; Schiffman Decl., 4/18/02 Memorandum, Exh. C.)

Schiffman stated in his declaration that plaintiff did not complete her work in a timely fashion, and when reminded to turn in her assignments she would become hostile, angry and antagonistic.  (Schiffman Decl. ¶¶ 12, 24, 27, 30.)  Moreover, plaintiff "repeatedly demonstrated that she failed to properly comprehend her assignment; failed to complete assignments in a timely manner; and regrettably made the same or similar mistakes."  (Schiffman Decl. ¶ 12.) Specifically, Schiffman stated that plaintiff never completed her orientation assignments, including a functional analysis, and failed to fill out her daily schedule although she was repeatedly told how to do so.  (Schiffman Decl. ¶¶ 12-16.)  According to Schiffman, plaintiff was often absent from her required work area, and often came late to department staff meetings or left them early.  (Schiffman Decl. ¶¶ 18, 20.)  In addition, Schiffman stated that plaintiff often behaved in an insubordinate and unprofessional manner.  (Schiffman Decl. ¶ 27.)  He specifically noted that plaintiff repeatedly photocopied payroll time sheets for her own records after being told that copies could be made only before Schiffman signed them.  (Schiffman Decl. ¶ 28.) After the third time Schiffman told her this, she reacted in a hostile manner and accused him of slander.  (Schiffman Decl. ¶ 29.)  According to Schiffman, he tried to clarify his statement, but

5

plaintiff responded by shouting, "I hope you don't walk away from everything in your life the way you are walking away from me."  (Schiffman Decl. ¶¶ 30-31.)  Schiffman informed his supervisor, Lemega, in writing about these incidents on April 17, 2002.  (Schiffman Decl., 4/18/02 Memorandum, Exh. C.)

Plaintiff testified about an incident on May 1, 2001, when Lemega saw her in the hallway at a time when she was supposed to be at a meeting, and asked her, "Don't you have someplace you're supposed to be?" Plaintiff responded "I'm on my way to a meeting,"and Lemega stated, "Well, stop talking and get over there."  (5/19/04 Christopher Dep. at 56:10-57:18.)  Plaintiff testified that Lemega raised his voice, pointed his finger toward the meeting room, and treated her "like a child."  (5/19/04 Christopher Dep. at 57:12-60:6.)

The next day, on May 2, 2002, Lemega emailed Guz, stating that "[a]fter discussing Ms. Christopher's progress with her immediate supervisor, it was decided that she should be dismissed from state service."  (Lemega Decl., 5/2/02 Email, Exh. H.)  That same day, Human Resources sent a letter to plaintiff informing her that her last working day would be May 17, 2002.  (Guz Decl., 5/2/02 Letter, Exh. I.)

Plaintiff filed an EEOC complaint on May 9, 2002.  (Bariya Affid., EEOC complaint, Exh. A.)  The EEOC issued a right to sue letter, and plaintiff timely filed her Complaint in this Court.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact" such that she is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute will not defeat a summary judgment motion unless the

dispute is both genuine and material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48

(1986).  At the summary judgment stage, the Court's "function is not [itself] to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial."  Id. at 249.  In so doing, the Court must construe the facts and all inferences that

reasonably could be drawn therefrom in a light most favorable to the non-moving party.  Bailey

v. United Airlines, 279 F.3d 194, 198 (3d Cir. 2002).

III.   **DISCUSSION**

Since this is a motion for summary judgment, the Court will examine the record in the

light most favorable to plaintiff.  Carrasca v. Pomeroy, 313 F.3d 828, 833 (3d Cir. 2002).

Plaintiff's allegations charge the defendants with ethnic and gender discrimination under

Title VII.  It  is not clear from the Complaint whether plaintiff intended as well to pursue a

disparate impact claim under Title VII, but to the extent she seeks relief on that basis, the record

does not establish the necessary support.  To establish a disparate impact claim, a plaintiff must

show that a particular employment practice creates a disparate impact on a protected group

through statistical evidence.  Wards Cove Packing Co., Inc. v. Antonio, 490 U.S. 307-08 (1989).

Establishing this type of claim requires statistical evidence of how the target group was treated

and how the target group should have been treated.  Hazelwood Sch. Dist. v. United States, 433

U.S. 299, 307-08 (1977) ("Where gross statistical disparities can be shown, they alone may in a

proper case constitute prima facie proof of a pattern or practice of discrimination.").  The

Complaint alleges that "African Americans are not hired for high positions" and African

Americans are required to have one year of work experience while Caucasians are not.  Plaintiff

has produced no statistical evidence in the record.  See McNeil v. McDonough, 648 F.2d 178,

182 & n.9 (3d Cir. 1981) (noting that it is plaintiff's burden to produce a meaningful statistical comparison in a disparate impact suit).

It is also not clear from plaintiff's testimony whether she is claiming retaliation.  She testified that she considers what happened to her during her employment at WDC resulted from her complaining about her salary.  (See 5/19/04 Christopher Dep. at 84:1-12.)  But plaintiff has not indicated that she was engaged in a protected activity or that any causal connection exists between a protected activity and an adverse employment action.  See Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 323 (3d Cir. 2000).

Therefore, to the extent plaintiff alleges disparate impact and retaliation, the Court grants summary judgment in favor of defendants on these claims.

Proceeding on the basis that plaintiff's civil rights claim is based on ethnic and gender discrimination under Title VII, the Court applies the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  As a pre-requisite, a plaintiff must establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) action occurred under circumstances giving rise to an inference of discrimination.  Jones v. School District of Philadelphia, 198 F.3d 403, 410-11 (3d Cir. 1999).

Once the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection."  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994.)  If the employer satisfies its burden of articulating a legitimate, nondiscriminatory reason for its action, "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the

evidence that the employer's explanation is pretextual." Id.  Throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff.  Id.

To defeat a motion for summary judgment after the employer satisfies its burden of production, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. at 764; see also Sheridan v. E.I. DuPont de Numours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996).

As an African-American female, plaintiff satisfies the protected class requirement for purposes of a Title VII claim.  She claims she suffered two adverse employment actions: (1) her position was downgraded, and (2) she was terminated.  Defendants dispute the first, but they concede that DHS terminated plaintiff's employment at WDC.  As such, plaintiff has established that she was subject to an adverse employment action.

Plaintiff must also establish that she was qualified for the position.  Defendants maintain that plaintiff was not qualified for the BMPT position because she "did not complete assigned tasks, failed to follow instructions or meet deadlines, was unprofessional and displayed inability to work with others."  (Def. Moving Br. at 17.)  In addition to arguing that plaintiff was not qualified for the BMPT position and thereby cannot establish a *prima facie* case, defendants use this same basis for their legitimate non-discriminatory reason to fire her.  The Court believes that the arguments about lack of qualification are better suited to justify a decision to fire her as opposed to establishing that she was not qualified in the first place.  Therefore, for purposes of

9

this analysis, the Court finds that plaintiff has satisfied her burden of demonstrating that she was qualified and the Court will continue with the *prima facie* analysis.

As part of her *prima facie* case, plaintiff must also produce evidence that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Defendants deny this, maintaining that plaintiff was unproductive and performing at a level below other employees, and that whatever problems she had at WDC were a result of her own poor performance. Defendants point out that many other African-American females were employed at WDC; in fact the department where plaintiff was employed consisted of 22 African-Americans, 18 Caucasians, 5 Hispanics, and 2 Asians. (See Guz Decl., 7/2/02 Email, Exh. J.) Also, there were 8 African Americans, 5 Caucasians, 5 Hispanics, and 1 Asian in the position of BMPT. (Def. Moving Br. at 16.) Plaintiff's testimony establishes that the individuals she claims she was treated differently from were all women. (5/19/04 Christopher Dep. at 171:14-172:1.)

In light of this, finding that plaintiff has met all the requirements of a *prima facie* showing is a stretch. However, even had plaintiff made out a *prima facie case*, she does not offer evidence of pretext to challenge the articulated legitimate, nondiscriminatory reasons defendants have offered to justify their actions. As stated in Fuentes, 32 F.3d at 763, defendants have a "relatively light burden" in this respect, and they rely on plaintiff's "numerous performance problems." (Def. Moving Br. at 21.) The Court finds they have met their burden. The analysis requires that in response that plaintiff show, by a preponderance of the evidence, that defendants' explanation is pretextual because a reasonable fact finder could either disbelieve defendants' reasons for terminating her employment, or conclude that discrimination was a motivating or determinative cause of defendants' decisions. See Fuentes, 32 F.3d at 764.

10

Plaintiff does not point to any facts to support either finding, nor does the Court discern any.  It appears that an incident took place between plaintiff and Lemega on May 1, 2002 that, viewed in the light most favorable for plaintiff, demonstrates highhandedness or plain rudeness on his part.  Even so, the record fails to demonstrate or raise an inference that Lemega's actions were spurred by any racial or gender bias.  Cf. Lawrence v. F.C. Kerbeck & Sons, 2005 U.S. App. LEXIS 11709, *3 (3d Cir. June 16, 2005) ("Title VII is not violated by 'mere utterance of an . . . epithet which engenders offensive feelings in an employee' or by mere 'discourtesy or rudeness,' unless so severe or pervasive as to constitute an objective change in the conditions of employment.") (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998)).

Nor is there evidence that demonstrates  nonmembers of the protected class were given more favorable treatment.  Plaintiff offers nothing to establish that she was treated differently based on her race or gender or that a Caucasian or male, in her same position, would have been treated better.  Nor does plaintiff adduce evidence of pretext as to defendants' articulated legitimate, nondiscriminatory reasons for their actions, specifically her "numerous performance problems."  (Def. Moving Br. at 21.)  Her conclusory assertion that she was a good worker is inadequate to meet her burden of production and persuasion in the face of  documented justification.

Plaintiff does succeed in exposing an administrative error regarding her offer (albeit she benefitted from it because she came in at a higher salary), and arguably she exposed discourtesy, rudeness, or dislike on the part of at least one of her supervisors.  But neither of these situations is sufficient to meet the burden on plaintiff to adduce evidence of discrimination – unless one assumes that because plaintiff belongs to a minority group and endured an arguably  rude

11

comment, discrimination is *per se* established, which is an unacceptable mental leap.  See Ness

v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981) ("a party resisting a (Rule 56) motion cannot

expect to rely merely upon bare assertions, conclusory allegations or suspicions"); see also

Jordan v. Allgroup Wheaton, 218 F. Supp. 2d 643, 651-52 (D.N.J. 2002) (holding against *pro se*

plaintiff who claimed his insubordination and disruptive and threatening behavior were provoked

by "racists"; court noting that while plaintiff might have been singled out and reprimanded by his

Caucasian supervisor, and even though the supervisor's decision may have been unfair or

motivated by personal dislike, there was no evidence of racial animus).

## CONCLUSION

In responding to defendants' motion, plaintiff has not provided specific facts showing

that there is a genuine issue for trial, as opposed to the mere allegations or denials that are in her

pleadings.  Defendants are entitled to summary judgment.  Their motion is **granted** and an

appropriate Order will be entered.


Dated:  August 2 , 2005                                s/ Katharine S. Hayden
                                                        Katharine S. Hayden, U.S.D.J.